UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JEANINE A. IDEKER, | ) | NO. EDCV 12-2248 AGR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION AND ORDER |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| Defendant. | ) | |

Jeanine A. Ideker filed this action on January 2, 2013. Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before the magistrate judge on January 15 and 16, 2013. (Dkt. Nos. 10-11.) On July 1, 2013, the parties filed a Joint Stipulation ("JS") that addressed the disputed issue. The court has taken the matter under submission without oral argument.

Having reviewed the entire file, the court affirms the decision of the Commissioner.

**I.**

## PROCEDURAL BACKGROUND

On December 27, 2004, Ideker filed applications for disability insurance benefits and supplemental security income benefits. In both applications, Ideker alleged an onset date of September 4, 1994. Administrative Record ("AR") 62, 374. The applications were denied initially and upon reconsideration. AR at 62. Ideker requested a hearing. On February 12, 2007, an Administrative Law Judge ("ALJ") conducted a hearing at which Ideker and a vocational expert ("VE") testified. AR 336-71. On April 24, 2007, the ALJ issued a decision denying benefits. AR 59-70. On August 31, 2007, the Appeals Council denied the request for review. AR 52-55. On December 31, 2008, the Appeals Council declined to reopen its decision after receipt of additional evidence. AR 6-41.

On March 31, 2011, this court issued a decision reversing the decision of the Commissioner and remanding for further proceedings. AR 383-95. Specifically, the ALJ was to consider additional medical records later submitted to the Appeals Council to determine whether they affected his findings as to Ideker's credibility and residual functional capacity ("RFC"). AR 395. On August 18, 2011, the Appeals Council remanded the matter to an ALJ for further proceedings consistent with the court's order. AR 398. On June 28, 2012, the ALJ conducted a hearing at which Ideker, two medical experts and a VE testified. AR 555-72. On September 11, 2012, the ALJ issued a decision denying benefits. AR 372-82. This action followed.

**II.**

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal

standards. *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523. In determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257. When the evidence is susceptible to more than one rational interpretation, the Court must defer to the Commissioner's decision. *Moncada*, 60 F.3d at 523.

## III.
## DISCUSSION

### A. Disability

A person qualifies as disabled, and thereby eligible for such benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003).

### B. The ALJ's Findings

The ALJ found that Ideker met the insured status requirements through March 31, 2000. AR 376. She had the severe impairment of fibromyalgia. AR 377. Ideker had the RFC to perform a range of light work.[1] She "can lift and/ or carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or

---

[1] Light work involves lifting and/or carrying no more than 20 pounds occasionally and 10 pounds frequently; sitting, standing and/or walking for six hours out of an eight-hour workday with regular breaks; pushing or pulling within those weight limits; occasionally climbing ramps, stairs, ladders, ropes, and/or scaffolds; occasionally stooping, kneeling, crouching, and/or crawling; and performing simple repetitive tasks. 20 C.F.R. §§ 404.1567(b), 416.967(b).

walk for six hours out of an eight-hour workday with regular breaks; she can sit for six hours out of an eight-hour workday with regular breaks; she is unlimited with respect to pushing and/or pulling, other than as indicated for lifting and/or carrying; she can occasionally climb ramps and stairs; she can occasionally balance, stoop, kneel, crouch, and crawl; she cannot climb ladders, ropes, or scaffolds; and she must avoid concentrated exposure to hazards such as moving machinery and unprotected heights." AR 377. Ideker was capable of performing past relevant work as a bank teller as actually and generally performed. AR 381.

### C. Credibility

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). At step one, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The ALJ found that Ideker's medically determinable impairments could reasonably be expected to produce the alleged symptoms. AR 378.

"Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (citation and quotation marks omitted). "In making a credibility determination, the ALJ 'must specifically identify what testimony is credible and what testimony undermines the claimant's complaints[.]'" *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (citation omitted). The ALJ found that Ideker's statements concerning the intensity, persistence and limiting effects of the alleged symptoms were not credible to the extent inconsistent with the RFC assessment. AR 378.

4

In weighing credibility, the ALJ may consider factors including: the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors (e.g., movement, activity, environmental conditions); type, dosage, effectiveness, and adverse side effects of any pain medication; treatment, other than medication, for relief of pain; functional restrictions; the claimant's daily activities; and "ordinary techniques of credibility evaluation." *Bunnell*, 947 F.2d at 346 (citing Social Security Ruling 88-13)[2] (quotation marks omitted). The ALJ may consider (a) inconsistencies or discrepancies in a claimant's statements; (b) inconsistencies between a claimant's statements and activities; (c) exaggerated complaints; and (d) an unexplained failure to seek treatment. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ incorporated the analysis of Ideker's credibility in the prior ALJ's decision. AR 378. As this court previously found, the first ALJ discounted Ideker's credibility for three reasons: (1) the objective medical evidence did not support the degree of disability alleged; (2) Ideker's statements were inconsistent with her daily activities; and (3) Ideker was prescribed conservative treatment. AR 393 (citing AR 66-67.)

**1. Objective Medical Evidence**

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). In evaluating this factor on remand, the ALJ considered the medical evidence submitted after the first ALJ's decision. AR 374, 378.

---

[2] "Social Security Rulings do not have the force of law. Nevertheless, they constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

The ALJ concluded that the objective medical evidence did not support the alleged severity of symptoms. AR 381. This conclusion is supported by substantial evidence. The ALJ found that, notwithstanding Ideker's complaints of neck pain with radiculopathy and numbness in her right thumb in October 1994, diagnostic testing of her upper and lower extremities showed no electrical evidence of sensory nerve root entrapment or encroachment. AR 378. A letter dated June 1995 from an eye specialist indicated her visual acuity would improve from 20/50 to 20/30. *Id.* Whereas Ideker complained of pain in the neck, back and extremities, and dizziness in February 1995, examinations in March-April 1995 showed intraocular movements were full, range of motion in the neck was slightly limited with mild cervical paraspinal muscle spasm and mild to moderate degree of lumbosacral paraspinal muscle spasm. AR 378-79. Subsequent examinations showed some decreased range of motion in the lumbar spine with negative straight leg raising. AR 379. During November 1996-February 1997, Ideker received epidural injections that alleviated her symptoms. *Id.* Neurological examinations in 1995 did not reveal additional findings. *Id.*

The ALJ adopted the prior decision regarding medical records in evidence at that time. On March 7, 2005, Ideker underwent a consultative psychiatric evaluation. 65, 261-66. Dr. Rodriguez diagnosed major depressive disorder in remission and assessed a Global Assessment of Functioning score of 70. AR 265. Dr. Rodriguez found no functional limitations from a psychiatric standpoint. AR 266.

In September 2007, Dr. Wang, a treating physician, opined that Ideker was totally disabled since 1996. However, Dr. Wang relied entirely on medical records from 1994-1996 and Ideker's subjective statements in August 2007. AR 29-30.

The ALJ noted that Ideker complained of pain in March 2009. Treatment records indicated few objective findings and Ideker was treated with medication.

AR379. Examination in June 2010 showed reduced range of motion and tenderness in the neck area, and Ideker was treated with medication. *Id.*

Ideker was examined by Dr. Flanagan, a consultative physician board certified in physical medicine and rehabilitation, in March 2012. AR 379, 477-91. Dr. Flanagan opined that, although Ideker complained of right foot pain, he found nothing in the examination to substantiate a diagnosis. Left foot pain was secondary to hallux valgus. Bilateral knee pain was secondary to patellofemoral syndrome. Bilateral shoulder pain was secondary to muscular strain. Upper back pain is secondary to thoracic myofascial strain. Neck and lower back pains were secondary to myofascial strain as well as mild degenerative disc disease.[3] AR 481. Dr. Flanagan opined Ideker was capable of medium work, with sitting, standing and walking limited to six hours out of an eight-hour workday. AR 482-88. The ALJ gave little weight to this assessment in light of the longitudinal evidence of muscle tenderness and decreased range of motion. AR 381.

Ideker also had a neurological examination by Dr. Maze in March 2012. AR 379, 471-75. Ideker's immediate recall and recent memory were fair. Her concentration and attention were not impaired. Her visual fields were full. Her motor strength was 5/5, and Dr. Maze noted very prominent give-away during

---

[3] Dr. Flanagan found full neck range of motion, although painful, and tenderness upon palpation of the cervical paraspinal muscles. With respect to Ideker's back, Dr. Flanagan found pain with minimal axial rotation of the trunk and pain with axial loading of the spine at the head. Flexion was 60°, and there was tenderness upon palpation of the thoracic and lumbar paraspinal muscles, and the spinous processes. There was pain upon palpation of the bilateral trapezial musculature. AR 479. With respect to Ideker's knees, Dr. Flanagan found pain upon range of motion of both knees and upon diffuse palpation in the anterior knees bilaterally. Ideker's range of motion in her ankles was within normal limits, but there was pain upon range of motion of the left 1st MTP joint. AR 480. Motor strength was grossly within normal limits. Dr. Flanagan noted 4/5 strength in certain areas but concluded that this "weakness was give-away in nature limited secondary to effort and pain and does not represent a true neurologic insult." AR 481. Dr. Flanagan observed decreased sensation in a non-dermatomal pattern in the left leg. *Id.*

motor testing. Dr. Maze noted poor effort in grip strength testing, which was 0.[4] Sensation was intact. AR 473. Her gait was stable and her coordination tests were performed well. Dr. Maze concluded that "[i]n spite of the enormous number of subjective complaints, she presents on this date with an unremarkable examination. Her strength, coordination, and gait are normal. She was observed to walk down a hallway in the medical office in a very stable manner, moving quickly and promptly."[5] AR 474. She did not provide an opinion regarding functional limitations. AR 380.

The orthopedic medical expert testified that the newly submitted medical records would not change the functional limitations in the prior decision. AR 380, 560-61. The second medical expert testified that, from a neurological standpoint, the newly submitted medical evidence would not change the functional limitations in the prior decision. AR 380, 563. Further, the treating physician's report in September 11, 2007, which concluded that Ideker was disabled because of nystagmus and a vestibular abnormality, was not reasonable. Although those conditions could cause occasional dizziness and could be left over from a head trauma, they would not cause total disability. AR 380, 563-64. Any effects would be accounted for by the functional limitations in the prior decision. AR 564. Further, the vestibular abnormality was not seen in the 2012 examination. AR 564.

When the evidence is susceptible to more than one rational interpretation, the court must defer to the Commissioner's decision. *Moncada*, 60 F.3d at 523.

---

[4] Ideker's treatment records also note that she did not give full effort on strength testing (although she was assessed at 4/5 at that point). AR 513.

[5] This is consistent with Ideker's treatment records. On February 2, 2012, it was noted that Ideker's cranial nerves were intact, her strength was normal 5/5 in all extremities, and she had a normal walk. AR 506. The only abnormality was the finger-to-nose exercise. *Id.*

8

### 2.  Conservative Treatment

The ALJ found that Ideker received conservative treatment. AR 378-79.

Ideker was injured at work in September 1994. AR 539. While opening a vault, the handle came off in her hands and Ideker fell back, hitting her head and back against the wall. She fell to the floor and felt stunned. AR 539.

In October 1994, Dr. Wang prescribed medication and chiropractic treatment. AR 521. In February 1995, Ideker reported being limited in her physical activity in terms of prolonged sitting, standing, walking and reading with her neck flexed down. AR 525. In March 1995, Ideker reported she had returned to work 3 hours per day for the past 3 or 4 days. She sat on a stool without back or neck support, and experienced increased back and neck pain. Dr. Wang continued medication and chiropractic care. AR 526-27. After two weeks, Ideker was off work and was continued on the same treatment. AR 528. In May 1995, Dr. Wang reported that Ideker improved with passive treatment of the neck and back, and anti-inflammatory medication until her return to work sitting on a stool. AR 530-31. Dr. Wang recommended that Ideker be continued on anti-inflammatory medication, anti-depressant medication and vestibular exercise. No surgery was warranted based on her existing condition. Dr. Wang opined that Ideker could not return to her previous employment at that time. AR 531.

In November 1995, Dr. Burres noted neck pain and radiating symptoms. An MRI revealed a C4-C5 moderate herniation with extrusion, central. AR 540. Dr. Burres noted that she would be a candidate for surgery if she failed to improve with epidural injections. AR 541. Ideker received physical therapy. AR 537-38. In November 1996, Ideker reported that she could walk barely half a block, had not been shopping in months, and could not find a comfortable position to sleep. Straight leg raising was positive at 30 degrees. AR 546.

Ideker received a series of four epidural injections in November-December 1996 and February 1997. AR 546-50. She apparently had a good result from the lumbar epidural treatment. AR 550.

More recently, in August 2007, Dr. Druet recommended cervical and lumbar epidural injections. However, Ideker wanted to wait to see if medications improved her symptoms. AR 37.

In November 2008 through April 2009, Ideker was treated with medications, diet and exercise. AR 492-96. It was noted that Ideker's symptoms were also associated with a high stress level due to loss of spousal support and not receiving SSI benefits. AR 496.

In June 2010, Ideker reported "doing okay" for the past year. AR 516. She reportedly was considering epidural steroid injections, which worked for her in the past, but stated that she would call the clinic back if she decided to go forward. She was continued on the same pain medications and asked to return in three months for follow-up and discussion of epidural injections. AR 516-17. There is no indication of any follow-up.

In May 2011, Ideker requested something different for her neck and back pain. She reported taking ibuprofen which sometimes helped. She reported taking medications very rarely because she preferred not to take them, but she wanted "something for when she needs it." AR 501. She was given a refill of ibuprofen and Vicodin as needed for pain. AR 502. In May-June 2011, Ideker received chiropractic manipulation and hydrotherapy. The chiropractor assessed that Ideker's condition was improving in a satisfactory manner. AR 533-35.

In February 2012, Ideker reported having a fibromyalgia flare-up, headaches and unbalanced walking at times. She also complained that certain spots on her head were tender to the touch. AR 505. Her physical examination was essentially normal except for finger-to-nose. AR 506. She was continued on medications. *Id.*

The ALJ's finding of conservative treatment in the period after Ideker's application for benefits is supported by substantial evidence. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (anti-inflammatory medication constitutes conservative treatment).[6]

### 3. Daily Activities

The ALJ incorporated the prior decision. For four or five years prior to the first hearing, Ideker had been going to garage sales, buying clothes and selling clothes on consignment at consignment shops. AR 66, 360-62. She was able to perform light household chores such as sweeping, dusting and vacuuming. AR 67, 357. She did arts and crafts during February through March or May 2006, but did not make enough money to cover her expenses. AR 67, 354-55. She drove a car to shop or run errands, or meet a friend. AR 67, 356-57. She had a computer and e-mail. AR 356. The prior decision also noted that Ideker was able to do light household chores such as sweeping, dusting and vacuuming. AR 67.

At the hearing on remand, Ideker testified that she did not remember how much time she spent going to garage sales and selling clothes through consignment shops. She described the activity as being done occasionally. AR 566. At the prior hearing in February 2007, Ideker testified that she did that activity whenever she could.[7] AR 361.

Again, when the evidence is susceptible to more than one rational interpretation, the court must defer to the Commissioner's decision. *Moncada*, 60

---

[6] Although epidural injections were discussed on two occasions in 2007 and 2010, there is no indication that Ideker went forward with the treatments at those times. The injections were reportedly successful in late 1996 and early 1997. *E.g.,* AR 35.

[7] "Because I go to garage sales sometimes if I can go, you know, here in town. I drive around or sometimes a friend would take me, and I'll find something." AR 362. "A lot of friends give me their clothes or their giftables that are, you know, more expensive things." *Id.*

11

F.3d at 523.  Moreover, even assuming the ALJ erred in his assessment of Ideker's activities of daily living, remand would not automatically result.  In *Carmickle v. Comm'r of the Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir. 2008), the Ninth Circuit concluded that two of the ALJ's reasons for making an adverse credibility finding were invalid.  The court held that when an ALJ provides specific reasons for discounting the claimant's credibility, the question is whether the ALJ's decision remains legally valid, despite such error, based on the ALJ's "remaining reasoning *and ultimate credibility determination*."  *Id.* at 1162 (emphasis in original); *see Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) ("in light of all the other reasons given by the ALJ for Batson's lack of credibility and his residual functional capacity, and in light of the objective medical evidence on which the ALJ relied, there was substantial evidence supporting the ALJ's decision").

Here, the ALJ's credibility finding remains supported by substantial evidence, and this court "may not engage in second-guessing." *Thomas*, 278 F.3d at 959 (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)).

## IV.
## ORDER

IT IS HEREBY ORDERED that the decision of the Commissioner is affirmed.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment herein on all parties or their counsel.

DATED: August 7, 2013

ALICIA G. ROSENBERG
United States Magistrate Judge

12